IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

KEITH CONWAY, as parent, legal guardian
and next friend of URSULA CONWAY, a minor,

    Plaintiff,

                                                    No. CIV 98-00931 MV/JHG

DOUGLAS MITCHELL, BRENDA PERRY,
LINDA SANDOVAL, JEANNIE CORDOVA,
ROY LOGAN, DERRICK TUCKER, and
DEBORAH HARTZ, in their individual and
official capacities,

    Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Defendants' Motion to Dismiss: Fourteenth

Amendment Due Process, Official Capacity, Section 41-4-12 State Tort, and Punitive Damages

Claim, filed February 22, 1999 **[Doc. No. 54]**, Motion for Partial Summary Judgment: Dismissal of

the Eighth Amendment Claim or in the Alternative, Dismissal of Plaintiff's Complaint Pursuant to the

Prison Litigation Reform Act, filed February 22, 1999 **[Doc. No. 58]**, and Motion for Partial

Summary Judgment No. II: Dismissal of Fourteenth Amendment Claim, filed March 25, 1999 **[Doc.**

**No. 62]**. The Court, having reviewed the pleadings, relevant law, and being otherwise fully informed,

finds that the motion to dismiss is well taken and will be **granted in part**, and that the motions for

summary judgment are not well taken and will be **denied**.

### Background

For purposes of these motions the facts are not substantially in dispute. Plaintiff, as the parent

and next friend of Ursula Conway ("Ursula"), alleges that Ursula, adjudicated a juvenile delinquent by the Children's Court of Santa Fe County as a result of a shoplifting incident, was being held in the custody of the State of New Mexico Children, Youth, and Families Department at the Youth Diagnostic and Development Center ("YDDC") at the time of the events giving rise to this complaint. Ursula was ordinarily housed in a single-sex dormitory, yet on May 4th, 1998 Defendants placed her in a solitary confinement cell within the euphemistically called "Adjustment Unit" of YDDC. On one side of Ursula's cell was a cell housing one male juvenile, while the cell on the other side housed two male juveniles. During the night, the two boys sharing a cell adjacent to Ursula's cell stacked their mattresses on the floor, gained access to a ventilation duct in the ceiling of their cell, removed its cover, and climbed through the duct into Ursula's cell. Once there, one of the boys raped Ursula while the other boy watched and shouted comments about the rape to the male juvenile in the third cell. Both assailants then battered Ursula, leaving her bruised. In all, the male juveniles remained approximately three hours in Ursula's cell.

Early during the presence of the male juveniles in Ursula's cell, YDDC staff visually checked Ursula's cell through a small eye-level opening in the door, but failed to detect them. Ursula could not herself reveal their presence for fear of retribution. Nor did staff notice that the juveniles were missing from their own cell. Defendant Cordova eventually discovered the juveniles in Ursula's cell some three hours after they initially entered. He immediately made radio notification of the discovery and YDDC staff removed the two juveniles from Ursula's cell. Ursula continued to be held in solitary confinement on May 5th, and was transported that afternoon to a hospital for a medical evaluation. A counselor from the Albuquerque Rape Crisis Center was present, and evidence was collected for a rape prosecution. The counselor gave Defendant Linda Sandoval her business phone number so

that Ursula could contact the Center if she wanted counseling. As a result of those events, Defendants disciplined Ursula, in part for being in violation of a rule which does not permit consensual sexual acts. Defendants placed her back in solitary confinement for approximately two weeks.

Plaintiff further alleges that Defendants were on notice of use of the ventilation duct as a way to travel between cells in the Adjustment Unit. Some months before the incident involving Ursula, a male detainee, using the ventilation system, entered a cell being occupied by a female detainee. Sexual relations took place, and the female juvenile was discharged a short time later, pregnant. A few weeks before the incident involving Ursula, one of the male juveniles involved in the attack upon her climbed into the ventilation system, only to be rescued by YDDC personnel when he became stuck in the duct. Plaintiff states that YDDC has, since May 4, modified the ventilation system so that the covers to the ducts can no longer be removed, a measure which Defendants could, and should, have taken prior to Ursula's rape.

Plaintiff maintains that other facts highlight Ursula's vulnerability and placed Defendants on notice that she should not have been sequestered in the Adjustment Unit in a cell to which male juveniles could gain entrance. According to Plaintiff, YDDC had two reports which should have called attention to Ursula's vulnerability as a victim of prior sexual abuse: a May 21, 1997, discharge summary and aftercare treatment plan from Rancho Valmora Residential Treatment Center, and a November 1, 1997, report by a YDDC consulting psychiatrist. The discharge summary stated that Ursula needed follow-up care for sexual abuse issues and mentioned both her continued feelings of guilt for a prior rape and her possible inability to identify dangerous interpersonal situations. The psychiatrist's report informed its readers that Ursula "require[d] a safe environment for the

completion of her sentence and for any adequate chance of rehabilitation." First Amended Complaint at 7.

Plaintiff alleges post-rape wrongdoing on the part of Defendants. He states that YDDC never contacted him about the May 4 rape, that Defendant Brenda Perry deliberately misinformed him about the rape, and that YDDC staff disconnected a phone call between Ursula and her attorney when Ursula started to discuss the rape. Plaintiff also states that Defendant Linda Sandoval refused to let Ursula contact the Rape Crisis Center, that a male counselor called Ursula a hooker, and that YDDC has done nothing to protect Ursula from threats of harm that resulted from her reporting the rape. Finally, Plaintiff alleges that on June 16, 1998, Defendants once again placed Ursula in the Adjustment Unit, where one of the juveniles involved in her rape verbally harassed and threatened her. Defendants took no action to protect Ursula from this emotional harm.

Plaintiff's complaint contains three counts. Count I alleges violations of guarantees of the Fourteenth Amendment's due process clause. Count II addresses violations of the New Mexico constitution, specifically Article II Section 4 and Section 18. Count III has alleged, without identifying a specific tort, negligence causing enumerated torts for which the New Mexico Tort Claims Act has waived sovereign immunity. At the root of Plaintiff's federal claims lie allegations of deliberate indifference to Ursula's rights.

For purposes of the present motions, Defendants generally do not argue with Plaintiff's version of events, but rebut the allegation of deliberate indifference with the affidavit of Mr. Lloyd Leonard Vallejos, a maintenance specialist at YDDC. Mr. Vallejos recalls three incidents in 1998 where detainees of the Adjustment Unit gained access to the ventilation ducts in the cells. The first, occurring in the early part of 1998, involved a successful attempt by detainee Alex Sosoya to tear the

vent off the ceiling. Mr. Vallejos repaired the damage by hammering the duct back into shape and securing it with heavier and longer screws. On April 23, 1998, another detainee unscrewed the vent cover and crawled into the ductwork. Mr. Vallejos again used larger, longer screws to repair the damage. After the May 4 Conway incident, Mr. Vallejos repaired the ventilation duct by redesigning covers for the duct, building a steel frame secured with heavy, tamper-proof lag bolts, and using thick gauge plastic to completely cover the vent ducts. Mr. Vallejos also applied silicone glue to secure the plastic cover.

The motion to dismiss presents several arguments. Defendants first maintain that Ursula, because she was a convicted prisoner at YDDC and not a pretrial detainee, cannot maintain a Fourteenth Amendment substantive due process clause cause of action. Instead, Defendants maintain, the Eighth Amendment provides the constitutional standard. Defendants also assert that the complaint fails to state a claim for Fourteenth Amendment violations under the doctrines of *Parrat v. Taylor*, 451 U.S. 527 (1981) and *Hudson v. Palmer*, 468 U.S. 517 (1984). As a second argument, Defendants state that the Eleventh Amendment mandates the dismissal of the official capacity component of this action. Next looking to the immunity afforded by New Mexico's Tort Claims Act, N.M. Stat. Ann. § 41-4-12 (Michie 1996), Defendants claim that the Act does not waive their immunity from the state tort claims because they are not law enforcement officers. Defendants also claim that the Act prevents an award of punitive damages for the tort claims.

Plaintiff counters by disputing that Ursula's detention can be compared to a prison setting. Instead, Plaintiff argues, the Fourteenth Amendment does apply to Ursula, a juvenile adjudicated delinquent, and not a prisoner. Plaintiff goes on to distinguish *Parrat* and *Hudson*, maintaining that the restrictions those cases impose only apply where deprivation of property is at issue. As his third

point, Plaintiff asserts that Defendants, by not raising the Eleventh Amendment in their first responsive pleading, have waived its protection.  Finally, Plaintiff argues that YDDC employees are law enforcement officers, and thus do not enjoy New Mexico Tort Claims Act immunity.

In their first motion for partial summary judgment, Defendants once again raise the issue of the Eighth Amendment's applicability, then argue that Plaintiff can present no evidence which would show that Defendants were deliberately indifferent to Ursula's Eighth Amendment rights.  In the alternative, Defendants urge this Court to dismiss the Eighth Amendment claim, arguing that Plaintiff has not exhausted his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e.  Plaintiff disavows any Eighth Amendment claim, arguing that he has only sought redress for Ursula under the Fourteenth Amendment.  Plaintiff also maintains that the PLRA does not apply to juvenile facilities, and states that even if it does, the lack of administrative remedies contemplating the damages claim makes the Act's exhaustion requirements inapplicable.

Defendants' second motion for summary judgment addresses Plaintiff's contention that only the Fourteenth Amendment is at the root of the § 1983 count.  Essentially repeating the argument they brought with respect to the Eighth Amendment, Defendants maintain that Plaintiff can show no evidence to support a deliberate indifference charge.  Plaintiff responds by asking the Court, pursuant to Rule 56(f), to deny the motion.  Plaintiff has supported his request with his attorney's affidavit.

**Discussion**

The Court first turns to an issue which cuts across many of the pleadings, namely whether the federal claim arises under the Fourteenth or the Eighth Amendment.  In a § 1983 action, courts must first identify the precise constitutional violations alleged.  *Baker v. McCollan*, 443 U.S. 137, 140 (1979); *County of Sacramento v. Lewis*, 523 U.S. 833, 841 (1998).  Defendants have challenged the

theory of recovery Plaintiff has cited, and argued that the constitutional rights Plaintiff has invoked in his § 1983 count flow from the Eighth Amendment. Plaintiff strenuously denies that he has brought a prison conditions case, and instead maintains that his sole constitutional claim is for violations of the Fourteenth Amendment's due process clause. Although ultimately the constitutional analysis under either source of rights may merge, *see Lewis*, 523 U.S. at 845-53, the Court is nevertheless called upon to make a distinction.

A reading of the complaint shows one source of the ambiguity which has given rise to Defendants' contention. Although at its core claiming deliberate indifference resulting in the single rape occurrence and its aftermath, Plaintiff's complaint alleges facts which may lead a reader to think in Eighth Amendment terms. For example, Plaintiff has described Ursula's cell in the Adjustment Unit and the limitations which solitary confinement placed on her activities. *See* First Amended Complaint at 3. Controlling precedent in this circuit, however, shows that Plaintiff's claim is rooted in the Fourteenth and not the Eighth Amendment.

*Milonas v. Williams*, 691 F.2d 931 (10th Cir. 1982), provides the precedent which dictates the adjudication of Plaintiff's claim under a substantive due process standard. In *Milonas* two students of the Provo Canyon School for Boys, a juvenile facility, complained of unconstitutional conditions of confinement. The school, which served correctional, detention, and mental health objectives, *id.* at 935-36, primarily received students at the insistence of their parents, but also received students "directly from juvenile courts and probation officers from around the nation." *Id.* at 936. In examining the constitutionality of certain of the school's practices which the trial court had enjoined, the appellate panel applied due process jurisprudence, expressly rejecting an Eighth Amendment standard in the juvenile context. As the court put it,

The eighth amendment's proscription against "cruel and unusual punishment" does not apply in a situation, such as we have in the instant case, where the involuntarily confined person has not been adjudicated guilty of any crime. *Bell v. Wolfish*, 441 U.S. 520, 535 n.16, 99 S.Ct. 1861, 1871 n.16, 60 L.Ed.2d 447 (1979); *Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). Any institutional rules that amount to punishment of those involuntarily confined prior to an adjudication of guilt of criminal wrongdoing are violative of the due process clause per se. The district court below properly rejected the plaintiffs' claim that the Provo Canyon School had violated rights guaranteed by the eighth amendment.

*Id.* at 942 n.10.

*Milonas*, then, drew a bright line which this Court must follow. Where the involuntary confined person has not been adjudicated of any crime, the Fourteenth Amendment applies.

Defendants attempt to distinguish *Milonas* by pointing to the "sufficiently analogous" language of *Ingraham* and arguing that a delinquency adjudication as a result of shoplifting is sufficiently analogous to criminal punishment to allow the application of the Eighth Amendment here. *Ingraham*, a case addressing the constitutionality of school-inflicted corporate punishment, was specifically postured as an excessive force and procedural due process case. *See Ingraham*, 430 U.S. at 659. There the majority noted that "[s]ome punishments, though not labeled 'criminal' by the State, may be sufficiently analogous to criminal punishments in the circumstances in which they are administered to justify application of the Eighth Amendment." *Id.* at 669 n.37. The Court, however, reserved judgment on "whether or under what circumstances persons involuntarily confined in mental or juvenile institutions can claim the protection of the Eighth Amendment." *Id.*

*Ingraham*'s "sufficiently analogous" language cannot be a basis for moving the case at bar away from a Fourteenth Amendment posture, where Plaintiff expressly looks for relief, and into an Eighth Amendment posture, where Plaintiff specifically declines to go. *Milonas*, which is still good

law in this circuit, expressly considered *Ingraham* when rejecting an Eighth Amendment argument. *Milonas*, 691 F.2d at 942 n.10. Moreover, the fact that not all detainees in *Milonas* were received directly from juvenile courts does not make *Milonas* inapplicable here. Some detainees clearly were in the same position as Ursula Conway, and the court just as clearly considered that fact in rendering its judgment. At least one other court has recognized that in this circuit as in some others the Fourteenth Amendment applies to juvenile detention cases. *See Alexander S. v. Boyd*, 113 F.3d 1373, 1377 n.3 (4th Cir. 1997).

Having resolved this initial dispute, the Court turns to the dispositive motions.


I.      The Motion to Dismiss

"[G]ranting a motion to dismiss is 'a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice.'" *Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1359 (10th Cir. 1989) (quoting *Morgan v. City of Rawlins*, 792 F.2d 975, 978 (10th Cir. 1986)). A court may not dismiss a cause of action under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts supporting her claim that would entitle her to relief. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249-50 (1989). In considering a Rule 12(b)(6) motion, the court must assume as true all well-pleaded facts, and must draw all reasonable inferences in favor of the plaintiff. *Housing Auth. of the Kaw Tribe v. City of Ponca City*, 952 F.2d 1183, 1187 (10th Cir. 1991). The issue in reviewing the sufficiency of a complaint is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence to support her claim. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). These deferential

rules, however, do not allow the court to assume that a plaintiff "can prove facts that [she] has not alleged or that the defendants have violated the.... laws in ways that have not been alleged." *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983).

In their motion to dismiss, Defendants allege in pertinent part that the complaint fails to state a claim under the *Parrat/Hudson* doctrine, that the Eleventh Amendment mandates dismissal of Defendants in their official capacity, that the New Mexico Tort Claims Act provides them with immunity because they are not law enforcement officers, and that the Act prevents an award for punitive damages for the tort claims. The Court only partially agrees.

It is clear that the Court must dismiss Defendants in their official capacity. Official capacity suits are but another method for pleading an action against the State. *See Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989); *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). The Eleventh Amendment generally bars an unconsented action for damages against a state. *See Edelman v. Jordan*, 415 U.S. 651, 677 (1974); *Elephant Butte Irrigation Dist. v. Dept. of the Interior*, 160 F.3d 602 (10th Cir. 1998). Plaintiff's only Eleventh Amendment argument is that Defendants have waived the state's immunity by not raising the Amendment in their first responsive pleading. Case law shows otherwise.

Defendants have not waived their Eleventh Amendment immunity defense by failing to raise it in their first responsive pleading. "Whether the Eleventh Amendment is an affirmative defense or a jurisdictional bar which can nonetheless be waived is not clear." *Flores v. Long*, 110 F.3d 730, 732 (10th Cir. 1997). Still, in *Mascheroni v. Board of Regents of the University of California*, 28 F.3d 1554, 1556-57 (10th Cir.1994), the Tenth Circuit characterized the Eleventh Amendment as a

constitutional limitation on the jurisdiction of Article III courts, and ordered a dismissal against a state agency for lack of jurisdiction. *Flores*, 110 F.3d at 732-33. The Eleventh Amendment, whatever its attributes, is jurisdictional in the sense that it can be raised for the first time on appeal. *See Pride v. Does*, 997 F.2d 712, 716 (10th Cir. 1993). Moreover, a state's consent to suit through waiver of Eleventh Amendment immunity must be clear and unequivocally expressed. *See College Savings Bank v. Florida Prepaid Postsecondary Education Expenses Board*, 119 S.Ct. 2219, 2226 (1999) (citing cases). The state's constitutional immunity cannot be waived simply by failing to raise it in a pleading, much less a first responsive pleading.

Despite Plaintiff's broad assertion that Defendants violated Ursula's Fourteenth Amendment due process rights, Defendants have focused on procedural due process in arguing that Plaintiff alleges only such a violation, warranting the dismissal of the § 1983 claim. Plaintiff, apparently unclear on the application of procedural due process to Ursula's case, focuses his response on distinguishing the *Parratt/Hudson* doctrine as being derived from cases where only a deprivation of property occurred. *See* Plaintiff's Response in Opposition to Motion to Dismiss at 4-5. The Court does not construe a rape, which no amount of process could justify, as implicating procedural due process issues. Instead, the Court finds Plaintiff's claim to involve the substantive due process guarantees of the Fourteenth Amendment, which the law recognizes as protecting the right to bodily integrity. *Abeyta by Martinez v. Chama Valley Ind. School Dist.*, 77 F.3d 1253, 1257 (10th Cir. 1996). The dismissal of the § 1983 count for failing to state a claim, therefore, is inappropriate.

Defendants contend that employees of YDDC, because they are not law enforcement officers, enjoy immunity from tort claims under New Mexico's Tort Claims Act. The Act, in addition to granting immunity to public employees, N.M. Stat. Ann. § 41-4-4, also in part waives that immunity

for certain enumerated torts committed by law enforcement officers.  *Id.* § 41-4-12.  A  law

enforcement officer is

> any full-time salaried public employee of a governmental entity whose
> principal duties under law are to hold in custody any person accused
> of a criminal offense, to maintain public order or to make arrests for
> crimes, or members of the national guard when called to active duty
> by the governor.

*Id.* § 41-4-3(D).

New Mexico courts have generally applied a literal interpretation of this definition.  In

*Calloway v. Dept. of Corrections*, 117 N.M. 636, 875 P.2d 393 (N.M. Ct. App. 1994), for example,

the court of appeals held that prison guards were not law enforcement officers, since their duties

included holding persons in custody who had been convicted, rather than accused.  *Id.* at 397.

Likewise, parole officers enjoy statutory immunity.  *Vigil v. Martinez*, 113 N.M. 714, 832 P.2d 405

(N.M. Ct. App. 1992).  On the other hand jailers, who hold in custody persons accused of crimes,

are law enforcement officers within the meaning of the statute.  *See, e.g., Methola v. County of Eddy,*

*et al.*, 95 N.M. 329, 332, 622 P.2d 234, 237 (N.M. 1980).

Drawing analogies for purposes of this motion from these cases and applying the Rule 12(b)(6)

standard, the Court concludes that Defendants have not met their burden of showing, construing all

reasonable inferences in Plaintiff's favor, that it appears beyond doubt he can prove no set of facts

supporting his allegation that § 41-4-12 applies to Defendants.  In deciding § 41-4-12 waiver issues,

courts must focus on the character of the principal duties of a facility' staff.  *See, e.g., Achondo v.*

*Corrections Dept.*, 100 N.M. 108, 666 P.2d 1255 (N.M. 1983); *Weinstein v. City of Santa Fe*, 121

N.M. 646, 649, 916 P.2d 1313, 1316 (N.M. 1996).  It is thus irrelevant that Plaintiff was at YDDC

as an adjudicated delinquent, that is, one who has committed an act "that would be designated as a

crime under the law if committed by an adult." N.M. Stat. Ann. § 32A-2-3 (Michie 1998). Rather, the Court considers whether YDDC is a place that detains only adjudicated, as opposed to alleged, delinquents.

Defendants have failed to state that the principal duties of YDDC staff is to detain adjudicated juveniles. Rather, Defendants have only alleged that the principal duties are to "supervise individuals who are *convicted prisoners* serving time at the YDDC." Memorandum in Support of Motion to Dismiss; Fourteenth Amendment Due Process, Official Capacity, Section 41-4-12 State Tort, and Punitive Damages Claims at 21; Reply at 5 (emphasis in original). New Mexico's laws do not consider adjudicated juveniles convicted prisoners. New Mexico has dedicated a separate statutory section addressing juvenile delinquents, *see* N.M. Stat. Ann. § 32A-2-1 to § 32A-2-32, and clearly declined to consider them "convicted prisoners." It is a misnomer, therefore, to categorize adjudicated delinquents as convicted prisoners. While this semantic distinction may ultimately prove to be one without a difference, on a Rule 12(b)(6) posture it is a distinction that this Court is compelled to make. Defendants, therefore, have not met their Rule 12(b)(6) burden.

Defendants' argument with respect to punitive damages is a non-issue. In his complaint, Plaintiff is obviously seeking punitive damages only on the federal claims. *See* Complaint at 12.

II.      The Motions for Summary Judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). Under this standard, the moving party initially carries the

burden of pointing out to the trial court that there is an absence of evidence to support the nonmoving party's case, although the moving party "need not affirmatively negate the nonmovant's claim in order to obtain summary judgment." *Allen v. Muskogee, Oklahoma*, 119 F.3d 837, 840 (10th Cir. 1997), *cert. denied*, 118 S.Ct. 1165 (1998), *citing Celotex v. Catrett*, 477 U.S. 317, 322-23, 325 (1986). The Court examines the factual record and all reasonable inferences therefrom in the light most favorable to the nonmoving party, *Allen*, 119 F.3d at 839-40, and materiality of facts in dispute, if any, is dependent upon the substantive law, *id.* at 839, *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once the movant has met this burden, Rule 56 requires the nonmovant to go beyond the pleadings and show, through affidavits, depositions, answers to interrogatories, and the like that there is a genuine issue for trial. *Allen*, 119 F.3d at 841, *citing Celotex*, 477 U.S. at 324; *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1988). Conclusory allegations are not enough, *see Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-72 (10th Cir. 1998), and summary judgment "is warranted only if the uncontroverted material facts establish that the moving party is entitled to judgment as a matter of law." *David v. City and County of Denver*, 101 F.3d 1344, 1355 (10th Cir. 1996).

A.     The Eighth Amendment Claim

Because the Eighth Amendment is not the source of rights to apply to the facts of this case, what remains of this motion is Defendants' alternative contention that the Court should dismiss this action for Plaintiff's failure to comply with the Prison Litigation Reform Act, 42 U.S.C. § 1997e.

Notwithstanding Plaintiff's argument to the contrary, the PLRA applies to juvenile facilities. The Act prevents a prisoner confined in a jail, prison, or other correctional facility from bringing an

action with respect to prison conditions unless that prisoner has exhausted administrative remedies. *See id.* § 1997e(a). The Act defines a prisoner as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for violations of criminal law." *Id.* §1997e(h). The plain language of the statute, therefore, shows that it encompasses YDDC within its scope. *Alexander S. v. Boyd*, 113 F.3d at 1383.

Plaintiff argues that he has not challenged conditions of Ursula's detention, but instead charges that the deliberate indifference of YDDC staff resulted in a one-time assault, in deprivation of her federal rights. Although § 1997e does not define the term "prison conditions," another section of the PLRA, codified at 18 U.S.C. § 3626(g)(2), does. *See Cruz v. Jordan*, __ F. Supp.2d __, 1999 WL 557519 at *5 (S.D. N.Y. 1999); *Beeson v. Fishkill Correctional Facility*, 28 F. Supp.2d 884, 888- 892 (S.D.N.Y.1998). Under that definition, a prison condition is one which addresses the "effects of actions by government officials on the lives of persons confined in prison." §18 U.S.C. 3626(g)(2). Courts have found that allegations of failure to protect from assault from other inmates are allegations concerning prison conditions. *See*, *e.g.*, *Mitchell v. Gomez*, 1997 WL 305273 (N.D. Cal. 1997); *McCoy v. Scott*, 1997 WL 414185 (N.D. Cal. 1997) (unpublished); *Midgette v. Doe*, 1997 WL 634280 (S.D. N.Y. 1997) (unpublished). This Court, however, need not decide whether the present litigation revolves around prison conditions, for even if does, making the PLRA applicable, Plaintiff may maintain the present action.

To say that the PLRA applies to YDDC and to assume that Plaintiff's litigation involves prison conditions, however, is not to say that the PLRA's exhaustion requirement requires dismissal of Plaintiff's claim in this instance. The remedy Plaintiff seeks, coupled with its administrative unavailability, precludes the procedural dismissal Defendants request. Plaintiff has sought both

monetary damages and Ursula's release from YDDC. Since the filing the complaint, however, that release has occurred. Thus the sole remedy available now is monetary damages. Defendants do not rebut Plaintiff's charge that monetary damages are not available as an administrative remedy from YDDC.

The PLRA mandates exhaustion of "administrative remedies as are available." 42 U.S.C. § 1997e(a). At least one court has written at length on this language and interpreted it to require the exhaustion of all administrative remedies even in the case where damages are sought, regardless of the possibility of monetary recovery. *See Cruz,* 1999 WL 557519 at *10 (S.D. N.Y. 1999). Despite this analysis, this Court is not persuaded that the words Congress used in this statute mandate an exercise in futility. Rather, a plain reading of this language suggests that a person covered by the Act must avail herself only of the remedies that the administrative forum offers to correct a grievance before bringing that claim to a judicial forum. Indeed, had Congress wished to require complete exhaustion as *Cruz* suggests, regardless of futility, Congress could easily have so stated in § 1997e. The law does not require exhaustion in cases where such exhaustion would be futile. *See, e.g., Honing v. Doe*, 484 U.S. 305, 327 (1988); *Heckler v. Ringer*, 466 U.S. 602, 619 (1984); *Weinberger v. Salfi*, 422 U.S. 749, 765-66 (1975). Where a detainee claims injuries for an assault at the hands of other detainees as a result of deliberate indifference, where a grievance procedure could not compensate her for her damages and where damages are the only relief sought, the PLRA does not require exhaustion. *See Freeman v. Godinez*, 996 F. Supp. 822 (N.D. Ill. 1998); *but see Beeson*, 28 F. Supp.2d at 887-96.

Nor does *Tafoya v. Simmons*, 1997 WL 337513 (10th Cir. 1997) (unpublished) counsel a different result. In *Tafoya* a prisoner complained of the defendants' failure to train correctional

officers and of being subjected to disciplinary hearings. *Id.* at **1. Without addressing the merits of the claims, the trial court dismissed for failure to exhaust administrative remedies. *Id.* The plaintiff appealed on the grounds that exhaustion would be futile, but the Tenth Circuit panel was not persuaded, finding instead that the plaintiff had not shown futility. *Id.* at **2. The court stopped well short, however, of concluding as the *Cruz* court did that exhaustion is required even where no administrative remedies are available. *See id.* at **1 n.1. By its language, the court even implied that where remedies are not available with regard to a claim, a plaintiff should not be required to exhaust other remedies. *Id.* The Court's conclusion here, then, conforms with *Tafoya*.

Even if exhaustion in the face of futility were required, the fact that Ursula is no longer detained at YDDC counsels against dismissal. Plaintiff has represented that Ursula has been released from YDDC since the filing of the lawsuit. Response at 6. Barring the failure to state a claim, a dismissal for lack of exhaustion should be one without prejudice. *See Mitchell*, 1997 WL 305273. Given that Ursula is no longer a prisoner as defined by the PLRA, on refiling she would no longer need to comply with that Act's requirements. *See Doe by and through Doe v. Washington County*, 150 F.3d 920, 924 (8th Cir. 1998). The Court will not require the parties to go through empty formalities. Thus, dismissal in the present case would be inappropriate.


B.      The Fourteenth Amendment Claim

During a scheduling conference held on December 11, 1998, the magistrate judge stayed discovery, with the exception of initial disclosures and the taking of two depositions, and limited other discovery to the two motions then contemplated, the motion to dismiss and the first motion for summary judgment. The magistrate also limited the motion practice to those two motions and set

a serving deadline of January 21, 1999. Nevertheless, Defendants prepared a second motion for summary judgment [Doc. No. 62] and served it on Plaintiff on February 22, 1999, one month past that deadline. Defense counsel explained in a telephone conference call that he thought it expedient to address Plaintiff's contentions with respect to the Fourteenth Amendment claim. Defense counsel had an obligation to follow the magistrate's orders limiting discovery and motion practice. It was clearly improper, therefore, to file an additional motion simply because an attorney thought it expedient at the time, and to proceed in derogation of a judicial ruling. Once identifying an issue he thought needed to be addressed sooner rather than later, counsel should have gone back to the magistrate to seek a modification of the limits imposed on the progress of this case. Yet despite defense counsel's not complying with the magistrate's order, in the interests of efficiency the Court will now consider this motion.

Defendants have alleged that Plaintiff can show no facts sufficiently supporting Ursula's deliberate indifference claim. Defendants also claim qualified immunity, although in their supporting memorandum they do little more than articulate a standard, without arguing in favor of that defense, and have only expounded on qualified immunity in the context of the magistrate's decision to stay discovery. *See* Reply to Response to Motion for Partial Summary Judgment No. II: Dismissal of Fourteenth Amendment Claim at 3. The Court, therefore, focuses on Defendants' claim that Plaintiff can not meet constitutional burdens of proof in this case.

Plaintiff has responded to this motion with a Rule 56(f) argument,[1] properly supported by

----

[1] Rule 56(f) allows a court to deny a motion or delay its ruling. The rule states:
> should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be

affidavit, and noting that the magistrate's suspension of discovery in this case prevents a meaningful response to Defendants' motion. Plaintiff seeks further discovery in the form of psychological reports in Defendants' control, depositions of Defendants, and service of interrogatories and requests for production.

In order to prevail on the Fourteenth Amendment substantive due process claim, Plaintiff must show more than simple negligence on the part of Defendants. *See Lewis*, 523 U.S. at 849; *Abeyta*, 77 F.3d at 1257. Plaintiff must show that Defendants' actions were arbitrary or conscience-shocking in a constitutional sense. *Lewis*, 523 U.S. at 847. Whether conduct shocks the conscience is partly a matter of context. Where police officers must act with haste and under pressure, the level of culpability that shocks the conscience is high. *See id.* at 853. On the other hand, when prison officials have the time to make unhurried judgments, with the chance for repeated reflection, and make decisions that are "largely uncomplicated by the pull of competing obligations," *id.*, then a substantive due process violation will only involve a mid-level fault, *id.*, lying somewhere between negligence and intentional conduct. *Id.* at 849. In the context of custodial decisions unhurried by emergencies, "forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for [her] own welfare." *Id.* at 851. In short, what Plaintiff must show in this instance is that there exists genuine issues of fact, in the applicable context, with respect to Defendants' acting with deliberate indifference to Ursula's constitutional right to bodily integrity.

Applying this standard the Court finds that, based on the limited discovery available so far to

---

taken or discovery to be had or may make such other order as is just.
Fed. R. Civ. P. 56(f).

the parties and the unrebutted allegations presented to the Court, Plaintiff has easily shown an issue of material fact. Ursula had special vulnerability, documented in prison files, with respect to being unable to recognize personally dangerous situations. Plaintiff has alleged at least two prior incidents where the YDDC administration was aware that juvenile detainees had gained access from one cell to another through a ventilation system. Plaintiff has alleged Ursula's being placed in a mixed-sex environment where monitoring was less than adequate. Plaintiff has alleged that on one prior occasion, access between cells took place for the purpose of engaging in sexual relations between juvenile detainees. Ursula was raped by two juveniles who gained access to her cell by the very means previously known to Defendants. Plaintiff has alleged that Ursula was beaten by those juveniles, who were able to remain in her cell for three hours without official action. Defendants have not denied a single allegation.

Against these allegations, Defendants have only presented an affidavit of a YDDC employee who repaired damage done to the ventilation system on three occasions, including the rape incident, each time with purportedly stronger security measures. Defendants claim that these repairs show conclusively, to the point of justifying summary judgment in their favor, that they did not act with deliberate indifference to Ursula's rights. The Court disagrees. The very reasonableness and sufficiency of the prior repair measures, along with the placement of Ursula in a mixed-sex environment, is a material issue of fact that goes to the heart of the deliberate indifference claim. Defendants have not met their burden of showing an absence of evidence to support Plaintiff's case.

Defendants allege a lack of evidence on the critical issue of their actual knowledge of prior incidents and the possible danger to Ursula. Defendants conveniently ignore in their argument that the magistrate stayed discovery, and that they filed this motion out of turn. Indeed, the discovery

Plaintiff seeks, in the form of depositions, requests for interrogatories, and requests for production, may very well highlight the contours of Defendants' knowledge leading up to the events of May 4, 1998.

In the alternative Defendants argue, citing *Pasternak v. Lear Petroleum Exploration, Inc.*, 790 F.2d 828 (10th Cir. 1986), that Plaintiff has insufficiently shown how further discovery will enable him to rebut the allegations of no genuine issue of fact. Defendants also argue that Plaintiff may not, pursuant to Rule 56(f), counter a summary judgment motion with the mere assertion that information supporting her allegations is in Defendants' hands. *See Weir v. Anaconda Co.*, 773 F.2d 1073, 1083 (10th Cir. 1985). The Court finds no merit in this argument. Discovery so far has been limited to Plaintiff's deposition of two juveniles and the exchange of initial disclosures. A deliberate indifference claim is rooted in a state actor's state of mind, in this case falling in the middle range between negligence and malicious or sadistic conduct. *See Lewis* 523 U.S. at 848-53. The discovery Plaintiff seeks could provide him with documentation on that state of mind. "Sufficient time for discovery is especially important when relevant facts are exclusively in the control of the opposing party." *Id.* at 1081. This case, unlike *Weir*, does not present an instance where information on a controlling question is in the hands of parties other than the ones against whom discovery is sought. *See id.* at 1083. Plaintiff has sufficiently met his Rule 56(f) burden and has sufficiently shown how additional discovery will enable him to rebut Defendants' motion. Summary judgment is not appropriate.

**THEREFORE,**

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss: Fourteenth Amendment Due Process, Official Capacity, Section 41-4-12 State Tort, and Punitive Damages Claim, filed

February 22, 1999 **[Doc. No. 54]** be, and hereby is, **granted in part**.

      **IT IS FURTHER ORDERED** that Defendants' Motion for Partial Summary Judgment: Dismissal of the Eighth Amendment Claim or in the Alternative, Dismissal of Plaintiff's Complaint Pursuant to the Prison Litigation Reform Act, filed February 22, 1999 **[Doc. No. 58]**, and Defendants' Motion for Partial Summary Judgment No. II: Dismissal of Fourteenth Amendment Claim, filed March 25, 1999 **[Doc. No. 62]** be, and hereby are, **denied**.

_____
MARTHA VÁZQUEZ
U. S. DISTRICT JUDGE


Counsel for Plaintiff                Counsel for Defendants
Sheri A. Raphaelson                John DuBois
Thomas Clark                       Stephen French